IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Carroll L. Johnson, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>————————————————) | Civil Action No. 6:14-3579-RBH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on August 23, 2011, alleging that he became unable to work on August 24, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On January 19, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Robert E. Brabham, Sr., an impartial vocational expert, appeared on June 5, 2013,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo* and on July 19, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on July 17, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> (2)    The claimant has not engaged in substantial gainful activity since August 24, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: gout and arthritis of multiple joints including hips, left ankle and foot, right knee, and lumbar spine; depression; and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with restrictions that require simple, routine tasks; no reading or writing beyond unskilled level; a supervised environment; no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; a two-hour stand [option] at the workstation; no climbing of ladders or scaffolds; no more than occasional use of foot pedals or other controls with the lower extremities; and avoidance [of] unprotected heights, vibration, and machinery with exposed, hazardous moving parts.
>
> (6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7)    The claimant was born on February 5, 1960, and was 49 years old, which is defined as an individual closely approaching

2

advanced age, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from August 24, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

4

(4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 49 years old on the alleged disability onset date and 53 years old at the time of the ALJ's decision. He has a high school education and past relevant work experience as a forklift operator, machine operator, and insulation worker.

On August 27, 2009, the plaintiff visited AmeriCare Health Family Medical Center to establish medical care, complaining of aches and pains in his hands, ankles, and feet with swelling and stiffness for one year "on and off" (Tr. 270, 273, 277-78, 283). The physical exam was unremarkable (Tr. 273). His lumbar spine x-ray revealed mild degenerative joint disease at L4-L5 (Tr. 270). The plaintiff returned on September 10, 2009, for follow-up on his blood work (Tr. 271). His laboratory study was negative for rheumatoid arthritis (Tr. 283). After this follow-up, the plaintiff did not seek regular medical

5

treatment before he applied for DIB and SSI in August 2011 (Tr. 180-90, 270-348, 355-97, 399).

On September 16, 2011, Pravin Patel, M.D., performed a consultative orthopedic evaluation of the plaintiff (including diagnostic testing) (Tr. 294-97). The plaintiff reported taking no medication (Tr. 294-95). The plaintiff was clear and coherent, and his fund of knowledge was good (Tr. 296-97). He was 5'8" tall and weighed 240 pounds (Tr. 295). The plaintiff's lumbar spine x-ray revealed bilateral facet arthropathy at L4-L5 and L5-S1, partial fusion with sclerosis of the S1 joints,and superior acetabular sclerosis with osteophyte formations (right greater than left) (Tr. 287). His left ankle x-ray revealed moderate degenerative changes of his foot with preserved joint spaces and juxta-articular sclerosis, and superior and inferior calcaneal spurring (Tr. 289). His right knee x-ray revealed juxta-articular sclerosis (most pronounced in the medial compartment) and minimal patellar osteophyte formation and enthesopathy (Tr. 290). His laboratory studies were negative for rheumatoid arthritis (Tr. 286). The plaintiff had no gross motor or sensory deficits, and his deep tendon reflexes were 2+ (Tr. 293, 296-97). The plaintiff made a very poor effort on range of motion testing (Tr. 296). However, he had normal range of motion of his elbows, wrists, hands, hips, and ankles (Tr. 292-93, 296). He could perform fine and gross manipulation with both hands and handle small objects like paper, pencils, etc. (Tr. 293, 296-97). There was no swelling, deformity, or instability of his cervical spine, shoulders, elbows, wrists, lumbar spine, hips, knees, and ankles (Tr. 296). The straight leg-raising test was 90 degrees in the sitting position (Tr. 292, 296). His coordination was good. He tandem walked, and walked on his heels and toes (Tr. 293, 296). There was no gait disturbance (Tr. 296). Dr. Patel found that the plaintiff was able to ambulate effectively and sustain a reasonable walking pace over a sufficient distance to carry out activities of daily living. He could independently initiate, sustain, and complete activities that would include reaching, pushing, pulling, grasping, and fingering to carry out the activities of daily living.

6

Dr. Patel's diagnostic impression was rheumatoid arthritis (by history without clinical evidence), hypertension, obesity, lower back pain syndrome, and neck pain (Tr. 297).

On October 21, 2011, Adrian Corlette, M.D., a physician consultant who worked with the State agency, reviewed the plaintiff's file and opined that he could perform a wide range of medium work (Tr. 78-80, 87-89).

On December 21, 2011, Katherine Kelly, Ph.D., a licensed psychologist, performed a mental status exam of the plaintiff (Tr. 299-302). The plaintiff complained that his attention and memory were "not good anymore" (Tr. 300). The plaintiff stated that he got along with most people, had a "few" friends, attended church about once or twice a month, occasionally went shopping, and got along with coworkers and supervisors when he worked (Tr. 299). He contended that he was diagnosed with rheumatoid arthritis, and "I'm basically left immobile, or incapacitated, whatever words you choose" for several days, and "I'm dependent on someone" (Tr. 300). He did not take any medication. The plaintiff was alert and oriented, and his personal hygiene was good. His affect was labile, and his mood was depressed, but his expressive speech was normal. His responses were appropriate and in context to the conversation. He understood all questions asked of him. He performed serial seven subtractions, wrote a sentence without a clue, read and comprehended directions, copied interlocking pentagon designs, and recalled words after an immediate and five-minute delay. He was able to provide historical information without hesitation. His thought processes were normal (Tr. 301). He exhibited good concentration and normal attention. His fund of information was normal. His intellectual functioning was within the low average to average range. His judgment and insight were good. He could care for himself in an emergency (Tr. 301-02). Dr. Kelly's diagnostic impression was major depressive disorder; however, Dr. Kelly noted that the plaintiff had never sought treatment. He was able to make decisions on simple tasks, and his social functioning was within normal limits (Tr. 302).

7

On January 9, 2012, Warren Holland, M.D., and Leslie Burke, a psychologist, reviewed the plaintiff's file for the State agency (Tr. 100-05, 114-19). Dr. Holland opined that the plaintiff could perform medium work (Tr. 102-04). In addition to considering the plaintiff's x-rays results, Dr. Holland explained that (1) the plaintiff's rheumatoid factor was negative; (2) he had no muscle weakness or atrophy; (3) he had no gait disturbance; (4) he had no joint swelling; and (5) he could walk in tandem and on his heels and toes (Tr. 104). Dr. Burke opined that the plaintiff could (1) carry out very short and simple instructions; (2) sustain an ordinary routine without special supervision; (3) maintain a work schedule (but may miss an occasional work day due to psychological symptoms); (4) work in coordination with or in proximity to others without begin distract by them; and (5) make simple work-related decisions. The plaintiff had no limitations in social interaction or adaption (Tr. 105).

On March 12, 2012, the plaintiff visited Chesterfield County Mental Health Care, where he saw Jack Rhyne, L.I.S.W., to establish treatment (Tr. 363-67). The plaintiff reported that his family had lost several members due to death recently (Tr. 367). He took Citalopram (Celexa), but no medication regularly for his physical health (Tr. 364). The plaintiff's appearance and hygiene were appropriate to the situation and he was cooperative. He was depressed and tearful (Tr. 365). His memory was intact; he was able to do simple math; and his fund of knowledge was average (Tr. 366). He was intelligent and articulate and tried to be respectful of others (Tr. 365, 367). Mr. Rhyne wrote that the plaintiff felt stuck and laid about the house with little or nothing to do, and he contended that it had become so bad that his wife (who had diabetes and lupus and from whom he was separated) needed to help him when she visited (Tr. 364, 367). Mr. Rhyne observed:

> Yet in spite of his complaints of stiffness, chronic pain, even immobility, he is taking nothing for arthritis – no Tylenol, no Motrin, no aspirin, and certainly not a special rheumatoid arthritis medication. Ct. could not really explain this. He says

> that he's always tried to do as much on his own as he could, but this does not preclude taking medicine. He also does not know any exercises or coping strategies that would alleviate his pain, such as taking a hot shower.

(Tr. 367). Mr. Rhyne diagnosed major depression and rated the plaintiff's Global Assessment of Functioning ("GAF") at 50[2] (Tr. 366). Mr. Rhyne assessed the plaintiff's prognosis as "very good" (Tr. 367).

On April 9, 2012, Christian Reusche, M.D., conducted a medication assessment (Tr. 368-70). The plaintiff said he began taking Celexa in February 2012 (Tr. 368). The plaintiff was alert, oriented, and cooperative; displayed no psychomotor abnormalities; displayed normal speech; had intact cognition (i.e., attention, concentration and memory); and had fair judgment and insight (Tr. 368-69). He denied having any manic symptoms, psychosis, paranoia, or audiovisual hallucinations (Tr. 368). His GAF was 50 (Tr. 369). The plaintiff was prescribed Celexa and Trazadone for insomnia on an as needed basis (Tr. 369-70). Otherwise, he was not taking any medication for his medical condition (e.g., arthritis) (Tr. 369)

On May 1, 2012, the plaintiff visited the emergency room for treatment of gouty arthropathy of his knees and ankles (Tr. 303-48). The plaintiff did not have a primary care physician. He was able to ambulate (Tr. 307). His mood and affect were appropriate. His back was not tender, and he had normal range of motion and alignment. He had normal range of motion and strength in his extremities. The plaintiff had mild effusion of

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

his right knee and some swelling in his ankle but intact pulses.  His sensory and motor exam was normal (Tr. 308).  He was given medication and discharged (Tr. 309).

On May 9, 2012, Dr. Reusche conducted a medication check (Tr. 371-72).  The plaintiff reported that he was doing better; his crying episodes had improved; he slept six to eight hours; his energy was better; and he was less hopeless and helpless (Tr. 371).  He admitted to using cocaine in April (Tr. 371).  His mental status exam was unremarkable (e.g., his cognition was intact) (Tr. 371).  Dr. Reusche raised the plaintiff's GAF rating to 60 (Tr. 372).

On June 6, 2012, the plaintiff told Dr. Reusche that he was doing okay (Tr. 373-74).  The plaintiff's concentration and energy were okay, and he was not hopeless or helpless.  The plaintiff's daughter was encouraging him to maintain tolerable physical activity, and he was excited about his new grandchild.  His mental status exam was unremarkable (e.g., his cognition was intact) (Tr. 373).  His GAF remained at 60.  The plaintiff was still not taking any medication regularly for his medical condition (Tr. 374).

On June 9, 2012, Mr. Rhyne reported that the plaintiff had made significant progress in the short time that he had attended therapy (Tr. 381).  The plaintiff had re-engaged with his family, and both his daughter and his ex-wife had encouraged him to continue with a proactive approach to overcoming depression including physical exercise.  The plaintiff discovered via Facebook that he had Irish ancestors, and he had a full time hobby exploring these connections and staying in touch with his extended family.  The plaintiff reported that he saw a rheumatologist for treatment of gout and had received some relief with Colchicine (medication for gout) and other anti-inflammatory agents.  The plaintiff's GAF was rated at 60 (Tr. 381).

On June 20, 2012, the plaintiff visited Pageland Family Medicine, where he saw George Butler, M.D., to re-establish medical care after his last visit in September 2008 (Tr. 355-58).  His blood pressure was controlled on medication and diet.  The plaintiff

advised that he was attempting to get disability and was diagnosed with rheumatoid arthritis by another provider. He reported that his additional problems included depression, which was responsive to Celexa, and insomnia, which responded well to Trazodone (Tr. 357). His medication was refilled (Tr. 358). His laboratory studies were negative for rheumatoid arthritis (Tr. 361).

On August 1, 2012, the plaintiff informed Dr. Reusche that he had been out of Celexa for one week and Trazodone for two weeks, and he complained of a depressed mood with poor concentration. The plaintiff's judgment was poor; otherwise, his mental status exam remained the same and his cognition was intact (Tr. 375-76). Dr. Reusche rated the plaintiff's GAF at 52. Dr. Reusche restarted the plaintiff's Celexa and Trazodone. The plaintiff was not taking any physical healthcare medication regularly for his medical condition (Tr. 376). On September 5, 2012, Bonnie Cundiff, L.P.C., reported that the plaintiff had been noncompliant with keeping his therapy appointments and rated his GAF at 50. The plaintiff appeared to be doing better and did not complain of pain (Tr. 382).

On September 26, 2012, Dr. Reusche performed a medication check (Tr. 377-78). The plaintiff was doing okay. He was active, playing with his dogs, and trying to put wallpaper up at his home. He enjoyed having visitors. His sleep and energy were okay. He was thinking more positively, and he denied having a depressed mood (Tr. 377). The plaintiff's mental status exam was unremarkable (Tr. 377-78). Dr. Reusche raised the plaintiff's GAF to 60. The plaintiff was not taking any medication regularly for his medical condition (Tr. 378).

On December 28, 2012, the plaintiff returned to see Dr. Butler (Tr. 388-90). The plaintiff's hypertension was controlled. His depression continued to respond well to Celexa. He denied having a recent flare of gout (Tr. 389).

On January 22, 2013, Dr. Reusche performed a medication check (Tr. 383-84). The plaintiff contended that he was depressed after finding out that he had lupus. He

11

was still playing with his dogs, talking to family members, and sleeping fine. He was okay with continuing his medication regimen (Tr. 383). Outside of poor judgment, the plaintiff's mental status exam was unremarkable (e.g., intact cognition) (Tr. 383-84). His GAF remained at 60 (Tr. 384).

On April 15, 2013, the plaintiff followed up with Dr. Butler. The plaintiff's hypertension was controlled, and his hyperlipidemia was improved (Tr. 386-87). His arthritis was followed by a rheumatologist (Dr. Charles Seehorn, M.D.) for which he took Prednisone as needed (Tr. 386-87, 390). He had not had a recent exacerbation of his gout (Tr. 386).

On May 16, 2013, Dr. Seehorn completed an "Arthritis Questionnaire." Dr. Seehorn reported that the plaintiff was diagnosed with arthralgia, myalgia, and gout with symptoms including pain, fatigue, and mood changes. Dr. Seehorn believed that the plaintiff's prognosis was fair from a rheumatology standpoint but guarded given a mood disorder. The plaintiff's objective signs included trigger point and tenderness; they did not include reduced joint motion, joint warmth and instability, sensory or reflex changes, swelling, muscle spasm, muscle weakness or atrophy, abnormal gait, positive straight leg-raising test, or crepitus. The plaintiff's pain was often severe enough to interfere with his attention and concentration. Dr. Seehorn stated that the plaintiff could walk four city blocks without rest, sit for about four hours and stand/walk less than two hours in an eight hour work day, and could continuously sit more than two hours and continuously stand for 30 minutes. Dr. Seehorn did not believe that the plaintiff could work an eight hour workday, and he needed a job that permitted shifting positions at will from sitting, standing, or walking. Dr. Seehorn opined that the plaintiff could occasionally lift less than ten pounds and never lift more than that and would have to take two to three unscheduled breaks per day. He further stated that the plaintiff was limited to low stress jobs (Tr. 394-97).

*Administrative Hearing Testimony*

The plaintiff stated that he had been disabled since August 24, 2009, when he suffered an injury to his left hand while working at Walmart. The plaintiff's left hand was pinched by rebars while he was trying to move them (Tr. 47-48). He alleged disability due to rheumatoid arthritis, gout, and lupus. He testified that he had received a worker's compensation settlement for $6,500 (Tr. 48). The plaintiff contended that he suffered from pain, stiffness, and swelling in his "joints," specifically his back, legs, knees, ankles, and left hand, since the 1990s. The plaintiff said that this occurs all the time and that these issues had caused him to lose his job as he was no longer productive (Tr. 51-52). Since the plaintiff stopped working, he applied for factory and production line work but was not hired (Tr. 53).

The plaintiff also complained that he suffered from depression and participated in mental health treatment for about one year (Tr. 53-54). He stated that he sees a counselor twice a month and a psychiatrist every three months and takes the prescription drug Celexa for his depression (Tr. 54). He further stated that his depression causes issues with his concentration, as he no longer thinks clearly and is becoming forgetful. He stated that he believes the loss of his job contributed to his depression and memory problems. He also said that his job loss has caused him to become less sociable (Tr. 54-56). The plaintiff further testified that because of his many (12) medications, he suffers from drowsiness.

The plaintiff stated that he believes he would only be able to lift less than ten pounds with either hand because of the problems to the rest of his body (Tr. 60-61). He also stated that he gets stiff when sitting or standing for more than two hours at a time, and believes he would only be able to walk one block before needing to stop or rest (Tr. 62-63) The plaintiff said that a cardiologist recommended that he have surgery because of a heart

13

issue (Tr. 63-64).  He did not feel that he would have difficulty understanding and carrying out instructions that he may be given on a job (Tr. 63).

The vocational expert testified in response to the ALJ's hypothetical question that a person with limitations as stated would not be able to perform the plaintiff's past relevant work but could perform the requirements of representative light, unskilled occupations such as assembler fabricator and production inspector (Tr. 67-69).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) rejecting the opinion of  treating physician Dr. Seehorn without giving good reasons for doing so; (2) making a flawed determination of his credibility; (3) failing to include a complete determination of his mental limitations in the residual functional capacity ("RFC") analysis; and (4) failing to evaluate all of his GAF scores.

### *Treating Physician*

The plaintiff first argues that the ALJ failed to properly consider the opinion of Dr. Seehorn (pl. brief at 9-11).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As set forth more fully above, Dr. Seehorn completed an "Arthritis Questionnaire" on May 16, 2013 (Tr. 394-97). Dr. Seehorn stated that the plaintiff's pain was often severe enough to interfere with his attention and concentration.  Dr. Seehorn further stated that the plaintiff could walk four city blocks without rest, sit for about four hours and stand/walk less than two hours in an eight hour work day, and could continuously sit more than two hours and continuously stand for 30 minutes. Dr. Seehorn did not believe that the plaintiff could work an eight hour workday, and he needed a job that permitted shifting positions at will from sitting, standing, or walking.  Dr. Seehorn opined that the plaintiff could occasionally lift less than ten pounds and never lift more than that and would have to take two to three unscheduled breaks per day. He further opined that the plaintiff was limited to low stress jobs (Tr. 394-97).

The ALJ set out Dr. Seehorn's opinion and determined that the opinion was not persuasive as it was "not supported by his progress notes and [was] inconsistent with

other substantial evidence from both treating and non-examining physicians" (Tr. 31-32). Accordingly, the ALJ accorded the opinion "some, but not full" weight (Tr. 32).

The plaintiff did not submit any supporting progress notes from Dr. Seehorn. Therefore, there were no notes documenting the length of Dr. Seehorn's treatment relationship with the plaintiff, the frequency of Dr. Seehorn's examination(s), and the nature and extent of the treating relationship.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (treating relationship as factor in weighing medical opinion). While the plaintiff criticizes the ALJ for not identifying any evidence from Dr. Seehorn's records that was inconsistent with the May 2013 opinion (pl. brief at 10), the fact is that there were no progress notes from Dr. Seehorn for the ALJ to consider.  The plaintiff argues that the Commissioner has engaged in improper *post hoc* rationalization by pointing out that there are no progress notes in the record from Dr. Seehorn (pl. reply at 1-2). The undersigned disagrees. The ALJ specifically stated that Dr. Seehorn's opinion was "not supported by his progress notes" (Tr. 32). Clearly, this is a finding supported by the record as the undersigned has been unable to find any other evidence in the record from Dr. Seehorn, and the plaintiff has pointed to none. To the extent the plaintiff considers the May 2013 opinion itself to be a "progress note," the opinion states that "the positive objective signs" were tenderness and trigger points (Tr. 31;*see* Tr. 394-97).  No other laboratory or diagnostic findings were included. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

The plaintiff further argues that the ALJ failed to identify the "other substantial evidence including [evidence from] treating and non-examining physicians" (Tr. 32) that was inconsistent with Dr. Seehorn's opinion (pl. brief at 10).  However, as argued by the Commissioner, the decision is to be read as a whole, not each section in isolation.  *See*

16

*Jones v. Barnhart*, 364 F.3d 501, 505 (3rd Cir. 2004). Elsewhere in the opinion, the ALJ noted that Mr. Rhyne, the plaintiff's therapist, assessed the plaintiff's prognosis as "very good" (Tr. 30; *see* Tr. 367, 381). However, in contrast, Dr. Seehorn, who is a rheumatologist, stated that the plaintiff's prognosis was fair from a rheumatology standpoint but guarded given his mood disorder (Tr. 31; *see* Tr. 394). Dr. Seehorn felt that the plaintiff's condition was severe enough to interfere with his attention and concentration, but the ALJ noted the results of Dr. Kelly's psychological evaluation in which Dr. Kelly found that the plaintiff's attention and concentration were within normal limits, and he could make decisions on simple tasks and take appropriate action in emergencies (Tr. 29; *see* Tr. 299-302, 394).

Furthermore, the ALJ considered the opinions of Drs. Corlette, Holland, and Burke, the medical consultants who reviewed the plaintiff's file for the State agency and who agreed that the plaintiff could perform the type of work defined by the ALJ in the RFC finding (Tr. 32-33; *see* Tr. 78-80, 87-89, 101-05, 114-19). The ALJ gave their opinions "considerable, but not controlling weight, as they are consistent with the medical records existing at the time of their evaluations" (Tr. 33). *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in

17

the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Moreover, the ALJ also considered the opinion of Dr. Patel (Tr. 28; *see* Tr. 286-98). The ALJ observed that Dr. Patel found that the plaintiff "made a very poor effort on range of motion testing"; could ambulate effectively at a reasonable pace, without a gait disturbance, over a sufficient distance to carry out his activities of daily living; and could independently initiate, sustain, and complete activities that included reaching, pushing, pulling, grasping and fingering (Tr. 28; *see* Tr. 297). Thus, as the ALJ highlighted in his decision, the other evidence of record did not support Dr. Seehorn's general opinion (Tr. 32).

Based upon the foregoing, the ALJ did not err in his consideration of Dr. Seehorn's opinion, and substantial evidence in the record supports the ALJ's finding.

### Credibility

The plaintiff next argues that the ALJ erred in the assessment of his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause

18

the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that the RFC finding was supported by the overall record including the objective medical evidence and the plaintiff's daily activities and testimony (Tr. 33). The ALJ stated that, in assessing the plaintiff's RFC, he considered the plaintiff's subjective allegations (Tr. 31) and that, while the plaintiff had medically determinable impairments that could reasonably cause his symptoms, the overall evidence did not support the alleged severity of his symptoms and, therefore, his complaints were "not entirely credible for the reasons explained in his decision" (Tr. 33).

The plaintiff argues that the ALJ's "conclusory" credibility determination was insufficient (pl. brief at 11-16). However, the undersigned finds that the ALJ sufficiently explained the basis of his credibility finding for purposes of judicial review (Tr. 27-33). Here, the ALJ noted Dr. Patel's finding that the plaintiff complained of chronic pain in his ankles, hands, knees, shoulders, low back, and neck, but he did not take any type of arthritis or pain medication (Tr. 28; *see* Tr. 294; *see also* Tr. 367 (Mr. Rhyne noting that the plaintiff could not explain why he was taking no medication despite complaints of stiffness, chronic pain, and immobility) and Tr. 369, 372, 374, 376, 378, 384 (notes showing no ongoing medication for arthritis) and 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (factor to be considered in credibility analysis includes type, dosage, effectiveness, and side effects of medication taken to alleviate pain or other symptoms)). The ALJ further noted that Dr. Patel reported that the plaintiff exhibited very poor effort on range of motion testing (Tr. 28; *see* Tr. 296). Further, the ALJ cited Dr. Patel's findings regarding the plaintiff's ability to tandem and heel to toe walk, lack of gait disturbance, and no need for assistive device; no joint deformities, swelling, tenderness, or muscle weakness; and ability to perform fine and gross movements (Tr. 28; *see* Tr. 292-93, 296-97).

With regard to the plaintiff's mental limitations, the ALJ noted that the plaintiff told Dr. Butler in June 2012 that his depression and insomnia were controlled with medications (Tr. 29; *see* Tr. 357). The ALJ also noted that when Dr. Kelly performed a

consultative mental status evaluation in December 2011, the plaintiff's concentration, attention, thought process, and social functioning were within normal limits. While the plaintiff endorsed symptoms associated with a major depressive disorder of a moderate to severe clinical level, he had never sought any mental health treatment. The plaintiff reported that he attended church, occasionally shopped, and spent his days taking his wife to work, praying, getting fresh air, thinking, and playing with his dogs (Tr. 29; *see* Tr. 299-302). The ALJ further cited records from the plaintiff's mental health treatment at Chesterfield County Mental Health Center for depression, noting that the plaintiff began treatment in March 2012, at which time he was given a GAF score of 50, and Mr. Rhyne assessed the plaintiff's prognosis as "very good." By June 2012, the plaintiff's GAF score was 60, and his mental status evaluation was essentially normal (Tr. 30; *see* Tr. 363-67, 381).

The ALJ also cited the plaintiff's activities of daily living in the credibility analysis (Tr. 33). *See* 20 C.F.R. §§ 404.1527(c)(3)(i), 416.927(c)(3)(i). The ALJ noted that the plaintiff played with his dogs, visited with friends, and had wallpapered his house and told his counselor (Mr. Rhyne) that his energy level had increased (Tr. 33; *see* Tr. 371, 377, 381, 383). Allegations of pain need not be accepted to the extent that they are inconsistent with the available evidence. *Craig*, 76 F.3d at 595. Although a claimant's allegations about his pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers. *Hines*, 453 F.3d at 565 n.3 (quoting *Craig*, 76 F.3d at 595).

Based upon the foregoing, the undersigned finds that the ALJ properly evaluated the plaintiff's credibility, and his findings are supported by substantial evidence. Accordingly, this allegation of error fails.

***Mental Impairment***

The plaintiff next argues that the ALJ erred in failing to provide a function-by-function analysis of the nonexertional mental functions associated with his depression (pl. brief at 16-21).  The ALJ found that the plaintiff's depression was a severe impairment (Tr. 27) that caused mild restrictions in activities of daily living and maintaining social function, moderate restriction in concentration, persistence or pace, and no episodes of decompensation of any extended duration (Tr. 30).  The ALJ went on to find in the RFC assessment that the plaintiff was limited to work that required only simple, routine tasks, no reading or writing beyond the unskilled work level, and a supervised environment (Tr. 31).

The plaintiff argues that the ALJ failed to adequately account for his moderate difficulties with concentration, persistence, or pace in the RFC assessment (pl. brief at 20). In a recent case cited by the plaintiff, *Mascio v. Colvin*, the Fourth Circuit Court of Appeals found as follows:

> [W]e agree with other circuits that an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir.2011) (joining the Third, Seventh, and Eighth Circuits). As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace.
>
> Perhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational

> expert. *See id.* at 1181. But because the ALJ here gave no
> explanation, a remand is in order.

780 F.3d 632, 638 (4ᵗʰ Cir. 2015).  In the *Winschel* case cited by the court in *Mascio*, the

Eleventh Circuit Court of Appeals stated:

> Other circuits have also rejected the argument that an ALJ
> generally accounts for a claimant's limitations in concentration,
> persistence, and pace by restricting the hypothetical question
> to simple, routine tasks or unskilled work. But when medical
> evidence demonstrates that a claimant can engage in simple,
> routine tasks or unskilled work despite limitations in
> concentration, persistence, and pace, courts have concluded
> that limiting the hypothetical to include only unskilled work
> sufficiently accounts for such limitations . . . .
>
> In this case, the ALJ determined at step two that Winschel's
> mental impairments caused a moderate limitation in
> maintaining concentration, persistence, and pace. But the ALJ
> did not indicate that medical evidence suggested Winschel's
> ability to work was unaffected by this limitation, nor did he
> otherwise implicitly account for the limitation in the hypothetical.
> Consequently, the ALJ should have explicitly included the
> limitation in his hypothetical question to the vocational expert.

*Winschel*, 631 F.3d at 1180-81.

Here, unlike in *Mascio* and *Winschel*, the RFC adequately accounted for the

plaintiff's limitations because the "medical evidence demonstrates that [the] claimant can

engage in simple, routine tasks or unskilled work despite limitations in concentration,

persistence, and pace."  *See id.* at 1180.  As the ALJ noted, Dr. Burke completed a

psychiatric review technique form ("PRTF") finding that the plaintiff was mildly restricted in

his activities of daily living and maintaining social functioning; moderately limited in

maintaining concentration, persistence, or pace; and had no episodes of decompensation

(Tr. 32; *see* Tr. 100).  As the ALJ further noted, Dr. Burke completed a mental RFC

assessment, finding as follows

> In consideration of medical functional findings cited on the
> current PRTF, the [plaintiff] has the following abilities: He is
> able to understand and remember instructions and is capable

> of performing simple tasks without special supervision. He is
> capable of maintaining a regular work schedule, but may miss
> an occasional work day due to psychological symptoms. He is
> able to sustain appropriate interaction with peers and co-
> workers without significant interference in work. He can make
> simple work related decisions, request assistance from others,
> and use available transportation. He can adhere to basic
> standards of hygiene and safety.

(Tr. 105, 119; *see* Tr. 32). The ALJ set out Dr. Burke's opinion in detail and specifically

provided it "considerable" weight in the RFC assessment (Tr. 32-33; *see* Tr. 104-05,

118-19). Notably, Dr. Burke's opinion includes a function-by-function analysis of the

plaintiff's mental functions, including his abilities to understand, carry out, and remember

instructions; use judgment in making work related decisions; respond appropriately to

supervision, coworkers, and work situations; and deal with changes in a routine work

setting. As the ALJ limited the plaintiff to work that required only simple, routine tasks, no

reading or writing beyond the unskilled work level, and a supervised environment,

specifically relying on Dr. Burke's assessment, the undersigned finds that the ALJ

adequately accounted for the plaintiff's moderate limitations in concentration, persistence,

or pace in the RFC assessment. *See Gilbert v. Colvin*, C.A. No. 2:14-981-MGL-MGB, 2015

WL 5009225, at *13-14 (D.S.C. Aug. 19, 2015) (distinguishing *Mascio* and *Winschel* and

finding that the ALJ accounted for the plaintiff's moderate limitation in concentration,

persistence, or pace in limiting the plaintiff to simple work and specifically relying on a

doctor's assessment that despite "difficulty sustaining her concentration and pace on

complex tasks," the plaintiff "should be able to ... perform simple tasks without special

supervision").

        The plaintiff also argues that the ALJ failed to address his ability to handle

stress (pl. brief at 21). However, as pointed out by the Commissioner, unskilled work is

generally low stress and involves remembering only very short and simple instructions in

a routine environment in which concentration is not critical. *See e.g.*, 20 C.F.R. §

404.1568(a) (defining unskilled work as work that needs little or no judgment and consists of simple duties that can be learned on the job in a short period of time); *Cox v. Colvin*, C.A. No. 3:14-cv-16455, 2015 WL 4878690, at *15 (S.D. W.Va. July 20, 2015) (finding that the ALJ took into account the claimant's "'poor' ability to handle work stress by restricting her from work that required 'fast paced production requirements,' and finding that she could perform only simple, routine, and repetitive tasks"); *Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration.").

        The plaintiff further argues that the ALJ failed to address his "mild" difficulties in activities of daily living and social functioning in the RFC assessment (pl. brief at 20). However, as argued by the Commissioner, a rating of "mild" generally signifies that the limitation is not severe, meaning that it does not significantly limit the ability to do basic work activities in that area. *See* 20 C.F.R. §§ 404.1520a(d)(1), 404.1521(a), 416.920a(d)(1), 416.921(a).  Here, there is no indication in the record that the combination of the plaintiff's "mild" ratings caused a significant work related limitation(s). Therefore, there was no cogent contradictory evidence for the ALJ to address, and thus a remand would be futile. *See Mascio*, 780 F.3d at 636-37 (noting that remand is futile in cases where ALJ does not discuss functions that are "irrelevant or uncontested," but remand may be appropriate when ALJ "'fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review'") (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

        Based upon the foregoing, this allegation of error is without merit.

### *GAF scores*

        Lastly, the plaintiff argues that the ALJ erred in failing to address all of his GAF scores (pl. brief at 21-22).  Specifically, the plaintiff contends that "[t]he Commissioner

has directed ALJs that GAF scores are medical opinions and are to be evaluated like all other medical opinions.  In this case[,] the ALJ only mentions two of the GAF scores in the record and fails to evaluate any of these medical opinions" (pl. brief at 21).

        The plaintiff was assigned a GAF of 50 in March and April 2012, when he was initially evaluated for treatment at Chesterfield County Mental Health Care (Tr. 366, 369). At the time, he was found to be a good candidate for cognitive therapy with behavioral modification.  His Celexa, which was first prescribed in February 2012, was adjusted, and he was prescribed Trazodone (Tr. 366-69).  The plaintiff was assigned a GAF of 52 in August 2012, after he began expressing symptomatic complaints (e.g., depressed mood) because he had not taken his Celexa and Trazodone, and he was assigned a GAF of 50 in September 2012, after he was non-compliant with keeping his therapy appointments (Tr. 375-76, 382).  Otherwise, once the plaintiff began mental health treatment and when compliant with his treatment regimen, his GAF scores were consistently at 60 (Tr. 372, 374, 378, 381, 384).

        In July 2013, the Social Security Administration ("SSA") issued a directive clarifying the impact of GAF scores on disability decisions. As the United States District Court for the Eastern District of North Carolina explained:

> It was important for the SSA to clarify the use of GAF scores because the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") abandoned the use of GAF scoring altogether. *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (abandoning use of GAF scoring "for several reasons, including its lack of conceptual clarity ... and questionable psychometrics in routine practice"). In Administrative Message 13066 (AM–13066), effective July 22, 2013, the SSA acknowledged that the DSM had abandoned use of GAF scoring and instructed ALJs that they should still consider GAF scores as opinion evidence in some circumstances. The SSA explained,
>
> > For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a

27

> GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by 20 CFR §§ 404.1527(c), 416.927(c), and SSR 06–03p, while keeping the following in mind:
>
> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

A GAF score is never dispositive of impairment severity.

AM–13066.

*Emrich v. Colvin*, No. 1:13cv1012, 2015 WL 867287, at *10 (M.D.N.C. Mar. 2, 2015).

Here, the ALJ noted the GAF score of 50, indicating serious to almost moderate impairment, in March and April 2012 when the plaintiff was first evaluated for mental health treatment (Tr. 30; *see* Tr. 366, 369). The ALJ also noted that the plaintiff was prescribed medications at that time, and the plaintiff's counselor, Mr. Rhyne stated that the plaintiff's prognosis was very good with continued therapy (Tr. 30; *see* Tr. 367). The ALJ further noted that by June 2012, the plaintiff's GAF score was 60, which indicated a moderate to almost mild impairment, and the plaintiff's mental status evaluation was essentially normal, his concentration and energy were okay, and the plaintiff was compliant with medications (Tr. 30; *see* Tr. 373-74).

Here, as argued by the Commissioner, the record shows that the plaintiff's GAF scores were generally at 60 except for those instances when he was not in his current treatment regimen (e.g., he was non-compliant with therapy or medication) (Tr. 366, 369,

376, 382). As set out above, the ALJ specifically considered the plaintiff's GAF scores of 50 and 60, and all the other GAF scores were within these ranges (Tr. 29-30, 366, 369, 372, 374, 376, 378, 381-82, 384).   Moreover, the ALJ discussed the circumstances surrounding the cited GAF scores, including that the plaintiff's counselor stated his prognosis was very good, his mental status exams were generally unremarkable, he did okay on medication, and he made significant progress in therapy (Tr. 30).  Moreover, none of the plaintiff's mental health treatment providers reported any mental functional limitations associated with the GAF scores that suggested that the plaintiff could not perform the range of work defined in the RFC assessment.  Based upon the foregoing, the undersigned finds that the ALJ did not err in his consideration of the plaintiff's GAF scores.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

August 28, 2015
Greenville, South Carolina